**Donald W. JEFFERSON, Jr.,\* Petitioner,**

v.

**Carol M. JEFFERSON, Respondent.**

**No. CS04–01926.**

Family Court of Delaware, Sussex County.

Submitted: Aug. 21, 2008.

Decided: Aug. 28, 2008.

\* Pseudonyms are used to pursuant to Supreme Court Rule 7(d).

Ashley M. Oland, Esquire, The Law Office of Edward C. Gill, P.A., Georgetown, DE, Attorney for the Petitioner.

Connie M. Jefferson, pro se, Georgetown, DE.

## DECISION AND ORDER–CUSTODY AND VISITATION

### HENRIKSEN, J.

This is the Court's Decision and Order on a petition to modify the custody and visitation petition filed by Father on May 14, 2008, seeking to modify the prior Custody and Visitation Consent Order entered into by the parties on February 23, 2007.

### BACKGROUND

The parties were married August 23, 1997, separated May 07, 2004, and eventually divorced by decree dated May 02, 2005. Their daughter, Theresa, was almost 5 years old when they separated. Theresa is now nine. Both parties have sought Protection From Abuse orders against the other, but each Protection From Abuse request ended with the parties agreeing to withdraw their petitions.

On June 23, 2004, the parties entered into their first Permanent Consent Order regarding custody and visitation. They agreed upon joint custody, primary placement with Mother, and standard visitation to Father. Each party listed as their address at that time [redacted], Millsboro, Delaware 19966.

Around September 01, 2005, the Division of Family Services, through two of its workers, issued a letter expressing concerns about Mother. At that time the Division was supporting a custody application by Father. The Division's supporting letter noted that Mother did not have stable housing for herself or the children. The letter stated that Mother was residing at her sister's house, but it was reported that Mother was often not there, leaving her sister to care for the children. The letter also reported that Mother had a gambling problem and was often out very late at Dover Downs. The letter from DFS also expressed the concern that Mother was meeting many different men and exposing her children to the men while not really knowing them. DFS indicated that Mother was meeting men on the Internet. Although the Division workers had a scheduled meeting with Mother on August 31, 2005, Mother did not keep that appointment, because she was in New Jersey with a man she had recently met.

Just prior to the Division's letter of September 01, 2005, Mother, at a support hearing, gave her address as [redacted], Milford, Delaware. On September 01, 2005, when Father filed his emergency petition backed by the Division of Family Services, he listed Mother's address as [redacted], Dover, Delaware, but also included a question mark about the address. On the Commissioner's Order dated September 01, 2005, which denied Father's request for emergency ex parte relief, one of the clerks in this Court wrote that they

had contacted Father and informed him of the Commissioner's ruling. The clerk also wrote that Father's response was "this is freakin' unbelievable—if you talk to the Commissioner tell her she is an 'asshole' ". The next day, September 02, 2005, Father filed another emergency application wherein he noted that the Kent County Family Court, in reference to Mother's two other children, had granted emergency relief based upon a similar request. On this particular date, a different Commissioner of this Court, again denied Father's request for emergency *ex parte* relief when the Commissioner indicated that the pleadings did not establish an imminent risk of harm.

On July 27, 2006, this Court held an interim hearing on Father's original motion to modify custody, which he filed on September 01, 2005. At that time, the court conducted separate, private, and recorded interviews of Theresa's then 15 year old half-sister, Janice Smith, and then 12 year old half-sister, Beth Smith, both of whom are Mother's biological daughters, and the former step-children of Father. At this hearing and as reflected in the Order, the Court learned that Theresa had been sexually assaulted by a minor male who was a neighbor of Mother's, namely, Johnny Donaldson.

Then 15 year old Janice recalled to the Court at the July 27, 2006 hearing that her mother had been talking to men on the Internet, but that she was not meeting them. She stated that her mother may have met one of the gentlemen she had met on the Internet. Janice informed the Court that her mother did not bring men home with her at night. Janice stated that she was not aware that her mother had any men in the house nor that her mother had intimate relations with any of these men when the children were also in the house. Janice also noted that her mother

used to go to the slots when she and her step-father had money, but according to Janice, Mother had not gone to the slots very often in the past two years. Janice indicated that she had a good relationship with both her mother and her step-father, and that she often visited her step-father when Theresa visited him. Janice recalled that there had been a time when she, her siblings, and her mother were living with other relatives. She noted, however, since December 09, 2005, Mother and the children had resided in an apartment complex which Janice indicated presented suitable conditions.

At this same hearing on July 27, 2006, 12 year old Beth told the Court that the last time her mother went to the slots was about two months preceding the hearing. Beth also indicated that for about three months, Mother had been dating a gentleman named Trey. Both Beth and Theresa stated that their mother was normally home with the children in the evening.

When the parties next returned to the Court on February 23, 2007, they had reached an agreement. The parties' agreement was entered as a Consent Order of the Court dated February 23, 2007. Pursuant to that agreement, the parties agreed to have joint custody, with primary placement with Mother. Father also obtained standard visitation guidelines, together with some additional time which is more specifically set forth in the Order itself. Of greatest interest for the hearing now before the Court, was the wording set forth in paragraph 7 of the parties' Consent Order, which stated the following:

> Although this is a Consent Agreement the parties have elected and agreed to treat this as an Order entered after a full hearing on the merits concerning the legal custody and/or primary residence of the child and, as such, is subject to

the two year modification rule set forth in DEL.CODE ANN. tit. 13, § 729(c).[1]

Father's first petition to modify the Consent Custody Order dated February 23, 2007, was filed on May 14, 2008, which is less than two years from the entry of the parties Order of February 23, 2007. By their agreement, the modification of their prior Order, which awards joint custody with primary placement to Mother, requires Father to prove that continuing the enforcement of the prior Order may endanger the child's physical health or significantly impair her emotional development.

## FACTS

During the present hearing, in addition to considering the overall burden of proof that Father must meet of demonstrating endangerment to the child's physical health or significant impairment of the child's emotional development, the Court considered the various best interest factors set forth in DEL.CODE ANN. tit. 13, § 722. Father is seeking the primary placement of his daughter to be changed to him. As an alternative, Father would be willing to enter into a shared placement arrangement where the parties would each exchange Theresa every Sunday evening, so long as Theresa would attend the Long Neck Elementary School. The Long Neck Elementary School is the school Theresa attended last year, and is in the district where Father resides.

Father resides in a double-wide trailer with an addition and a garage containing three to four bedrooms located in Millsboro, Delaware, where Father, except for a brief interruption when Mother resided in the home, has lived there for nine years. Father has been employed as a mechanic for DelDot for the past year. Before that, he was out of work while he had neck surgery. Prior to the neck surgery, Father worked for Millsboro Ford for eight years. Father has a GED followed by some technical school.

In addition to Father residing in the double-wide mobile home in Millsboro, Father's fiancée, Nancy Flannigan, to whom Father has been engaged for three months, also resides there, as does Nancy's 20 year old son Richard Flannigan. Father and Nancy have set a wedding date for November 15, 2008.

In the event of an emergency, or simply to facilitate Theresa leaving and returning home from school, Father has arranged for his next door neighbors to meet Theresa when she gets off the school bus. If all else fails, Father's parents live only two miles away from Father and could be there if needed. Father's fiancée, Nancy, just started working in the custodial service at Stockley Center. She has an 11th grade education and is now pursuing further classes to obtain her diploma.

Presently residing with Mother is her 17½ year old daughter Janice, although Janice is about to enter the Marines. Mother's 15 year old daughter Beth, continues to live with Mother. Mother's sisters, Tilly and Felicia, and also Mother's mother, reside in the Dover, Delaware area, and have contact with Theresa.

---

1. Modifications of prior orders, DEL.CODE ANN. tit. 13, § 729(c) (2006) ("An order entered by the Court after a full hearing on the merits concerning the legal custody of a child or his or her primary residence may be modified only as follows"):
    (1) If the application of modification is filed within 2 years after the Court's most recent order concerning these matters, "the Court shall not modify its prior order unless it finds, after a hearing, that continuing enforcement of the prior order may endanger the child's physical health or significantly impair his or her emotional development."

Mother has completed her GED, and is now in her second semester at Delaware Tech pursuing a paralegal degree.

Father has three major concerns, the combination of which he believes raises to the level of the burden of proof he must meet in order to modify the present Consent Custody Order between the parties. Father must prove that continued primary placement of Theresa with Mother may endanger Theresa's physical health or significantly impair her emotional development. First of all, while Father has remained living at the same address for the past nine years, except for a brief interruption, Mother has had multiple addresses which has caused Theresa multiple changes in school. The litany of Mother's several moves are as follows:

1. As of September 01, 2008, Mother will be acquiring a two bedroom mobile home on [redacted], which is in the Millsboro School District. At this residence, Theresa would normally attend the East Millsboro School. Theresa would share a bedroom with her 15 year old sister Beth, and Mother would have the other bedroom.

2. From April 2008, to the present, Mother has resided in a home on [redacted] between Bridgeville and Georgetown, Delaware. This location involved Theresa attending the East Millsboro School, which is the same school which Mother would like Theresa to return to at this time once Mother completes her most recent move.

3. For two to three years prior to the [redacted] residence, Mother resided at the [redacted] Apartments near Millsboro, Delaware.

4. When Theresa was beginning the 1st grade, Mother and the children temporarily resided with her sister in Dover, Delaware, and Theresa attended the 1st grade in the Capitol School District for a few days. Forty-nine days later, Theresa was living at the [redacted] apartment address with her mother.

5. The Court gets somewhat confused with the several addresses, and the timing of those residences; however, the Court also understands that Mother and the three girls resided for four to six months at [redacted] in Millsboro, Delaware with Ellis Showell. At some point in time, just prior to Theresa's entry into 1st grade, Mother, the girls, and Ellis Showell resided for a few weeks to 1½ months with Mr. Showell's sister at Bowers Beach.

6. It is clearly a factor to be considered that Mother has had multiple residences in the past few years.

Father's next concern is that Mother has been involved with numerous men in intimate relationships, and Mother has exposed Theresa to those numerous relationships. It should be noted that Mother indicated that Father had four to five relationships since the parties separated. However, there was absolutely no evidence which would suggest Father exposed Theresa to these various relationships, nor was there any testimony about the extent and duration of those relationships. On the other hand, the following information, not rebutted by Mother, indicates that Mother entered into several intimate relationships, exposing the children to knowledge of at least the existence of a possible significant relationship on each occasion, and without using any appropriate discretion and consideration about the effect so many failed relationships might have on Theresa:

1. Almost at time of separation, Mother was involved with a gentleman

named Jacob who she met on the computer. This relationship appears to have lasted for a few months, although Mother only acknowledged that Jacob came over to the house during the evenings for approximately eight days.

2. Then there was a gentleman named Galen from New Jersey, who Mother also met on the Internet. She spent several weekends in New Jersey with Galen, and the children went with her.

3. There was an unnamed man from Pennsylvania, who supposedly was a carpenter.

4. Ellis Showell moved into the residence with Mother and the three girls for a period of about four to six months. They lived at the [redacted] address in Millsboro, Delaware. Mother stated that she knew Ellis for at least 20 years. According to Mother, she ended the relationship with Ellis when she realized he was abusing alcohol and prescription drugs. The apartment in Millsboro was a two bedroom apartment. It is obvious that Mother and Ellis Showell were sharing one of the bedrooms, and the three girls were in the other bedroom.

5. At some point in time, while Mother was back at the [redacted] Apartments in Millsboro, Delaware, Mother spent a few long weekends with an individual named Trey. Mother moved Trey out when she learned he was a crack-head.

6. There was also a man named Rick from Virginia who spent some time with Mother. Father had occasion to meet Rick, especially when Father had to go retrieve the children because Rick's actions were frightening the children.

7. Mother's most recent love interest was a gentleman named Colin Daggett. Mother and Colin Daggett acquired property together, where Mother has been residing since April, and soon will vacate. Colin Daggett is married. Mother claims that she did not know that Colin Daggett was married, and that she ended the relationship as soon as she discovered Mr. Daggett was married.

8. In Mother's own testimony she acknowledged that she is unable to pick a good man. She stated if the kids don't like the man in her life, she then gets rid of the man. She stated that the children told her one month after she started seeing Colin Daggett that they did not like him. However, the testimony obtained at a hearing on July 24, 2008, reflects in the Court's Order that Mr. Daggett and Mother's relationship ended sometime in mid-June 2008, after they had been seeing each other for about six months. Upon her separation from Mr. Daggett, Mother acknowledged that she had another gentleman move into the house "for protection."

In the Court's opinion, Mother has used very poor judgment in rushing into intimate relationships, exposing her children to the relationships, not learning about the various individuals before exposing the children to the relationships, and only ending the relationships when she purportedly realized that the gentlemen were either total losers or the children did not like the gentlemen, probably because they were total losers, or in Mr. Daggett's case, married. Mother has allowed Theresa to be exposed, not only to numerous individuals who may have put Theresa in danger or expose her to improper conduct, but also

to an absolute lack of morality where Theresa is only learning from Mother's example that it is appropriate to engage in intimate relationships with numerous individuals over a relatively short time period.

Father's final concern about Mother's care of Theresa is Mother's failure to follow through with getting Theresa to school so that Theresa obtains a proper education, and also learns the meaning of commitment to an education. Mother's lack of commitment to getting Theresa to school led to a warrant being issued by Carrie Blake, the truancy officer, for the Indian River School District. The notice of prosecution was issued on May 08, 2008. Ms. Blake testified at the May 28, 2008 hearing that Theresa had 24 events of either being late or missing school, and of those, there were 20 absences of which 17 were unexcused. Although the Court learned at this hearing that some of those unexcused absences involved Father taking Theresa on a trip to Florida, and that sometimes Theresa was sick, most of the times involved Mother not getting Theresa to school. The Court remembers very well the statement of Theresa that, despite her mother not working, there were occasions when Mother could not get out of bed to take Theresa to school even after Theresa had awakened her mother. As the Court suggested to Mother in that Order, "Mother needs to get up, see that her child is provided with an appropriate breakfast, and arrives at school in a timely fashion."

Noting the timing of the May 28th hearing, that being near the end of the school year, the Court was not going to take any action in making a change of placement at that time. However, the information received at that hearing about Mother's failure to undertake her responsibility to waken Theresa, prepare her breakfast, and transport Theresa timely to school, still gives the Court great concern. This gives the Court even more concern since the Court learned from Theresa that her older sister Janice, who is no longer in the home, having joined the Marines, used to take care of waking Theresa in the morning.

In coming to its present Decision, the Court also reviewed the history of domestic violence between these parties and their respective criminal records, as well as the criminal record of Father's fiancée, Nancy. As to Nancy M. Capers, now known as Nancy Flannigan, born January 23, 1971, the Court observed that Nancy had some previous problems with driving under the influence, the most recent event which occurred in May of 2003, and as far back as February, 1994. Nancy was also involved in some domestic related incidences, which Father indicated Nancy had told him involved an individual in her past who was a poor influence on her. Thus, in April 1998, she was arrested for a charge which eventually ended in a plea of disorderly conduct. In September of 1997, Nancy eventually pled guilty to possession of certain illegal drugs. In March of 1996, Nancy was arrested for a charge which eventually resulted in a finding of guilt to carrying a concealed dangerous instrument. In December of 1995, Nancy was arrested for a crime which occurred in May of 1994, which eventually resulted in a guilty plea to theft under $500.00. Also in November 1994, Nancy was involved in an event which eventually led to a guilty plea to terroristic threatening. Fortunately, Nancy's record has been relatively clean, except for certain motor vehicle violations, since May of 2003. Father indicated that Nancy had also discussed with him her prior criminal history. Nancy's driver's license has been valid since January 30, 2007.

A review of Father's criminal record causes the Court no concern. Father has a motor vehicle violation back in April of

1995, along with some other motor vehicle violations before that time. Almost 20 years ago, in March of 1988, Father took a first offender's status guilty for possession of non-controlled prescription drugs. In 1986, Father also had a theft under $500.00 conviction. Mother has no Delaware criminal history.

The Court interviewed 9 year old Theresa on the morning following the trial. One would have to describe Theresa as an extremely alert, intelligent, vivacious, pleasant, and attractive young lady with beautiful skin and lovely thick curly brown hair. She demonstrates a maturity beyond the normal 9 year old. Despite having experienced her parents' separation and divorce, as well as many of her mother's moves and unsuccessful relationships with men, and also despite having an awareness of the squabbling that continually goes on between her parents, she continues to be a very happy child. The Court believes that Theresa's wishes and opinion should be given great weight in making this decision in her best interest.

As Theresa has expressed previously to this Court, she wants her parents to have joint custody and shared placement with her alternating weeks between them. In the past, Theresa attended the school in Dover for only a brief time, and did not like that school. She also has attended both Long Neck Elementary and East Millsboro Elementary in the past. She described both schools as good schools with good teachers. If she has a choice, she would prefer to go to East Millsboro Elementary where she has more friends. Both of these schools are relatively close in time and distance to where her father presently lives, and has lived for the past nine years. Both schools are also close to where her mother will soon be taking up residence in a new apartment.

The Court, noting its concern about the numerous moves that Mother has made in the past which might disrupt Theresa's schooling placement again, suggested to Theresa the possible shared placement arrangement with her attending the Long Neck School. You could tell that Theresa had some disappointment about that possible decision. Theresa left no doubt by her reaction to her favoring a shared placement arrangement with her attending the East Millsboro Elementary school.

Unfortunately, although the Court's Order of July 24, 2008 requested that the parents determine from the various school districts the possibilities of Theresa attending one school if the child lives with one parent one week and the other parent the other week, neither parent came prepared with that information. But with the knowledge that such arrangements have been accepted by various schools in the past, the Court is hopeful that the elementary school established by this Order for Theresa to attend will accept the fact that she is living in a shared placement arrangement with each of her parents, and alternating between them every Sunday evening.

Theresa informed the Court that since the hearing on May 28, 2008, when there was a concern that Theresa had missed so much school, she did not miss any school thereafter for the remainder of the year. She also told the Court that her mother has been waking up earlier with her, and sometimes made her cinnamon toast for breakfast. Apparently, and unfortunately, Theresa does not get a really good breakfast at either her mother's home or her father's home. She did say that she gets to cook sometimes with her paternal grandfather.

Theresa's oldest half-sister, Janice, will soon be joining the Marines. Theresa's half-sister, 15 year old Beth, who is living

with Mother, will be attending the Millsboro Middle School. Beth and Theresa get along fine. Theresa also likes her father's fiancée, Nancy, very much. She is very excited about their upcoming wedding on November 15, 2008, of which she will be a part. She also likes Nancy's son Richie. When asked about a situation where Nancy might have been chasing children around the house with a taser gun, Theresa laughed, explaining first that Nancy would not hurt anyone. Apparently an incident did occur where Nancy was chasing one of her children around the house with a taser gun, but it was not armed, and the incident was all done in fun. Nancy has sold her taser gun which she used to have for protection when she lived alone as a single parent.

Theresa finds it easy to speak with her mother. Although she is not afraid of her father, she indicated she is afraid to tell him things at times. She could not explain why she is afraid of her dad, because he has never harmed her, and she does not feel he ever would harm her. Mother clearly attends to Theresa's feminine needs when she takes Theresa to a professional hairdresser to have her hair thinned so that it can curl at its best.

Theresa knows that her parents have a somewhat tumultuous relationship, but she indicated they try not to fight in front of her. This past weekend, she felt that her father poorly handled the situation over her changing clothing on a visitation exchange. Theresa felt her father overreacted in a situation where he was concerned that he had not seen some clothing that he sent with Theresa over to her mother's. The situation caused Theresa to cry. She was disappointed that her father did not call her and apologize for his actions. Theresa also described a recent situation where her father was trying to do a trick on his motorcycle, and the trick went bad.

Theresa's perspective of what occurred did not rise to an improper level of conduct, although Mother thought it poorly reflected on Father's conduct.

Previously in this Opinion, the Court has noted its concern with Mother's behavior around her girls, Theresa included, in entering into intimate relationships with several men, and with the girls being aware of all of those relationships. Theresa said that sometimes these men were nice, and she trusted them. But some of the other men caused Theresa concern. She indicated she did not know what they were going to say or do. One of those gentlemen was Mother's most recent relationship, the married man named Colin Daggett. She indicated that Mother and Colin Daggett saw each other for about a year. She indicated that Colin Daggett never acted badly in front of Theresa, but that her sisters had told her some things that Colin Daggett was alleged to have done, which caused Theresa concern.

Theresa also said that Mother's friend Trey caused her concern. The Court heard at various times during the hearing between the parents, from Mother, that Mother saw Trey for a few long weekends. Mother indicated she knew that Trey was battling an addiction. Mother had stated that Trey was coming around to see her for about six months. Theresa recalled the relationship lasting for about 1½–2 years. Probably the most alarming thing about Trey, and the fact that Mother was allowing him to be around the girls, was that Theresa specifically remembers that Trey was wearing an ankle bracelet.

Theresa recalled the time when Rick was getting rather upset, and Theresa and her sisters called Theresa's father to come and get them. Theresa also remembered the Greek gentleman named Galen, and said he was a good guy. The gentleman named Ellis, who Mother said the children

adored and was living with Mother and the girls for four to six months, was described by Theresa as a liar who drank a lot. Theresa also remembered a gentleman named Norton, also from New Jersey, who Mother dated a short time.

Theresa told the Court that her mother would talk to her sometimes about the gentleman she was dating by telling Theresa that she liked the gentleman, and asking Theresa what she thought of the gentleman. The Court did not seek more specifics from Theresa about those discussions because of Theresa's age. Theresa believes that her mother has now been seeing someone for the past week, but she has not yet met the person.

### CONCLUSION

The Court should note that the Court asked Theresa if she had a preference as to which parent she would primarily reside in the event the Court chose not to enter an order of shared placement. Theresa either could not, or would not, state her preference. Although listening to the tape recording of the conversation might not lead one to be able to distinguish a preference, this Judge's observation of Theresa's facial reactions suggested that she might be somewhat disappointed if she was not living primarily with her mother as opposed to living primarily with her father, but the expression was almost indiscernible. Theresa has now been consistent in the past many months that she wants to live with each of her parents in a shared placement arrangement alternating week to week.

The question then becomes whether Father has met his burden of proof so that this Court is able to modify the Consent Order entered into between the parties on February 23, 2007, which gave Mother primary placement, and where the parties, without the benefit of counsel, agreed that

placement could not be modified within a two year period unless it could be proved that continuing the Order of February 23, 2007, "may endanger the child's physical health or significantly impair . . . her emotional development."

It is the Court's opinion that Father has met his necessary burden of proof to cause a modification of the parties' previous Consent Order. Mother has failed in her parental obligations to demonstrate to her child the importance of schooling, maintaining stability for a child, and demonstrating appropriate morality. Parents are the key role models in their children's lives. How parents live their lives, and the emphasis that parents place on things which they deem appropriate, such as schooling, are very likely to establish a pattern that the child will follow as the child becomes an adult. For whatever reason, Mother has lived in many places. Mother is presently unemployed, although Mother said she was a healthy individual. Hopefully, Mother's unemployment will be a matter of short duration. In the past, Mother was unable to get herself out of bed, despite not having a nighttime job, in order to see that her child was taken to school. Fortunately, Theresa is an extremely intelligent child who was able to pass her last school year despite Mother's failures. Finally, and probably most importantly, Mother has shown extremely poor discretion in her introduction to Theresa of the several individuals with which Mother has had intimate relationships. One of those individuals was even wearing an ankle bracelet. The combination of all of these shortcomings by Mother, especially if they continue to occur in the future, is likely to endanger Theresa's physical health, and will certainly significantly impair her emotional development. If Mother has not already enrolled herself in a counseling program, she should con-

sider doing so. Father needs to work on controlling his anger and emotions, especially towards Mother in Theresa's presence. At least from Theresa's perspective, Father's behavior this past weekend during the exchange over the clothing issue caused Theresa to come to tears, and she believes her father should apologize to her. Likewise, the Family Court Clerk's recorded statements of Father calling a Commissioner who denied his emergency request, an "asshole" was inappropriate.

Thus, the Court has determined that a change of the prior Order from primary placement with Mother is necessary and appropriate in Theresa's best interest. The parties will now share placement of Theresa by exchanging her every Sunday at 6:00 p.m. throughout the entire year. A separate Order issued by this Court will also reflect the division of other major days through the year. Assuming the Long Neck Elementary school or the East Millsboro Elementary school will permit Theresa to attend one of their schools under such a shared placement arrangement, the Court will direct that Theresa shall attend the East Millsboro Elementary school, which is Theresa's preference. The Court will note, however, that it made this school selection reluctantly in light of Mother's past instability in maintaining a stable residence. It is the Court's sincere hope that Mother will continue to maintain the Forest Park residence Mother has in-

dicated she intends to move into, or at least that Mother maintain another residence still in the East Millsboro Elementary school district area. Continuing moves by Mother in the future which cause this child to be taken out of the East Millsboro Elementary school district, will permit the Court to entertain an emergency motion from Father to review where the child will attend school, and possibly to a further modification of the child's placement to primary placement with Father. Father has shown a definite stability in staying in the same residence over the past nine years. In the event the East Millsboro Elementary school will not permit this child to attend under the shared placement arrangement, the Court then directs that the child attend the Long Neck Elementary school, assuming that school also would permit such an arrangement.

This is the Decision of the Court. Because of the considerable detail about the personal lives of these individuals, the Court has entered a separate Order suitable for presentation to the school district or districts.

IT IS SO ORDERED.